IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KIMBERLY ROGERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-354-WC |
| | ) | |
| SOUTHEAST PSYCHIATRIC | ) | |
| SERVICES, INC., *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION AND ORDER

## I.     INTRODUCTION

On May 14, 2014, Plaintiff Kimberly Rogers[1] ("Plaintiff") filed a three-count Complaint against the following defendants:   Southeast Psychiatric Services, Inc. ("SPS"); Professional Resource Management of the Wiregrass ("PRM"); and Meghani Medical, P.C. ("Meghani Medical").   This complaint alleged:   unlawful sex and pregnancy discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et. seq.*; unlawful interference in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 *et. seq.*; and breach of contract under Alabama state law.   Jurisdiction is proper under 28 U.S.C. § 1331.   All parties have consented to the conduct of all proceedings and entry of a final judgment by the undersigned United States Magistrate Judge.   Pl.'s Consent to Jurisdiction (Doc. 13); Defs.' Consent to Jurisdiction (Doc. 14).

---

[1] During the time relevant to this action, Plaintiff was also known as Kimberly Baliles and Kimberly Jones.

Before the court is Defendants' Motion for Summary Judgment (Doc. 37) and Memorandum of Law in Support (Doc. 38).  Plaintiff filed a Response to Defendants' Motion for Summary Judgment (Doc. 39), and Defendants filed a reply (Doc. 40).

Upon consideration of the Motion for Summary Judgment (Doc. 37), the pleadings of the parties, and the evidentiary materials filed in support thereof, and for the reasons that follow, the court finds that the Motion is due to be granted in part and denied in part.

## II.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Only disputes about material facts will preclude the granting of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  A[] [dispute] is 'material' if it might affect the outcome of the case under the governing law."  *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion[,]" and alerting the court to portions of the record which support the motion.  *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986).  However, once the movant has satisfied this burden, the nonmovant is then similarly required to cite to portions of the record which show the existence of a material factual dispute.  *Id.* at 324.  In doing so, and to avoid summary judgment, the nonmovant

"must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact" as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine dispute for trial exists, the court must view all the evidence in the light most favorable to the nonmovant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

III.    STATEMENT OF FACTS

The court has carefully considered the pleadings in this case and all documents submitted in support of, and in opposition to, the Motion for Summary Judgment. The submissions of the parties, viewed in the light most favorable to the nonmoving party, establish the following relevant facts.

### A.    *Statement of Undisputed Facts*

SPS contracted with Plaintiff on January 25, 2010, to provide neuropsychology services to patients in the Dothan, Alabama area. Pl.'s Ex. (Doc. 1-1) at 1. The contract specified that Plaintiff would commence employment by February 1, 2010, and the term of the contract would be for three years. *Id.* Thus, the contract would have expired on February 1, 2013.

In 2010 and 2011, Meghani Medical did business as SPS, the entity with which Plaintiff contracted to perform services. Mr. Meghani Depo. (Doc. 38-2) at 6.[2] Plaintiff worked for Meghani Medical during the years of 2010 and 2011, receiving her W-2 from that entity. Compl. (Doc. 1) at 3. On December 28, 2011, Meghani Medical merged with PRM. *Id.* PRM employed Plaintiff from that time until her termination in 2012. *Id.*

Plaintiff's salary was originally set at $80,000.00 per year. Pl.'s Ex. (Doc. 39-1) at 2. In 2011, Plaintiff was given a $10,000.00 raise, and Plaintiff's salary remained at $90,000.00 through the date of her termination. Pl.'s Depo. (Doc. 38-3) at 11.

---

[2] Defendants SPS, Meghani Medical, and PRM were all owned by Dr. Shakir Meghani, who will be referred to in this opinion as "Dr. Meghani." Dr. Meghani's nephew, Mr. Hasnain Meghani, was an employee of Defendants involved in the termination of Plaintiff. He will be referred to as "Mr. Meghani" throughout this opinion.

Plaintiff's contract did not contain set hours during which Plaintiff was to be at work or a total number of hours that Plaintiff was expected to work, other than stating that Plaintiff "agreed to work full time."  Pl.'s Ex. (Doc. 39-1) at 2.  Defendants did not maintain any attendance records to reflect the specific hours Plaintiff was at work or to reflect the total hours Plaintiff worked.  Mr. Meghani Depo. (Doc. 38-2) at 26.[3]  As part of her duties, Plaintiff saw patients in her office on Mondays, Tuesdays, and Wednesdays, and reported to the hospital to provide in-patient care on Thursdays and Fridays.  Pl.'s Depo. (Doc. 38-3) at 13.

At all times relevant to this proceeding, Dr. Meghani was both the highest officer of SPS, Meghani Medical, and PRM, and a physician working therefor.  Dr. Meghani Depo. (Doc. 38-1) at 5; Mr. Meghani Depo. (Doc. 38-2) at 7.  Dr. Meghani had the ultimate decision-making authority for Defendants.  Dr. Meghani Depo. (Doc. 38-1) at 7; Mr. Meghani Depo. (Doc. 38-2) at 7; Ms. Gilley Depo. (Doc. 38-5) at 4.  Mr. Meghani worked for Defendants as Director of Physical Plant and Information Technology.  Pl.'s Ex. (Doc. 39-3) at 6.  Mr. Meghani's duties included supervising the front desk and billing departments.  Mr. Meghani Depo. (Doc. 38-2) at 5.  Ms. Nancy Gilley ("Ms. Gilley") worked for Defendants as a Business Manager and, for the majority of the time Plaintiff was employed with Defendants, was responsible for maintaining personnel files.

---

[3] The hours Plaintiff actually worked and whether those were satisfactory are facts in dispute, discussed further below.  Although attendance records were not maintained as a matter of course while Plaintiff was employed by Defendants, Defendants did, after Plaintiff's termination, create a chart "show[ing] the average number of hours worked by [Plaintiff] per week during the years of 2010, 2011, and 2012."  Pl.'s Ex. (Doc. 39-5) at 6.  An explanation of how this document was

Pl.'s Ex. (Doc. 39-3) at 6.   Mr. Meghani and Ms. Gilley shared many roles in the administration of the office, including counseling employees for poor work performance. Mr. Meghani Depo. (Doc. 38-2) at 10; Ms. Gilley Depo. (Doc. 38-5) at 5.   Shortly before Plaintiff's termination, Defendants hired Mr. Adam Bollaert ("Mr. Bollaert") as the Director of Human Resources and named Ms. Jennifer Simmons ("Ms. Simmons"), a nurse working for Defendants, as Director of Clinical Departments.   Mr. Bollaert Depo. (Doc. 38-4) at 5; Ms. Simmons Depo. (Doc. 38-6) at 3; Pl.'s Ex. (Doc. 39-3) at 6.   Soon after he started as the Director of Human Resources, Mr. Bollaert formed an executive committee to formally designate Defendants' core managers.   Mr. Bollaert Depo. (Doc. 38-4) at 6.   That committee was comprised of Mr. Meghani, Ms. Gilley, Mr. Bollaert, and Ms. Simmons.  *Id.*

At all times relevant to this action, Defendants had an Employee Handbook that called for progressive discipline "involv[ing] a verbal warning, followed by a written warning, followed by more severe action including possible termination, if the conduct does not improve." Pl.'s Ex. (Doc. 39-7) at 20.   Defendants have no documentation of Plaintiff receiving verbal or written warnings.   Dr. Meghani Depo. (Doc. 38-1) at 8; Mr. Meghani Depo. (Doc. 38-2) at 21; Ms. Gilley Depo. (Doc. 38-5) at 15.

While Plaintiff was employed with Defendants, Defendants designed and built a new office building, which included a space specifically for Plaintiff's practice.   Mr. Meghani Depo. (Doc. 38-2) at 26-27; Ms. Gilley Depo. (Doc. 38-5) at 18.

---

created shows that the totals reflected on the sheet are the number of hours Plaintiff billed to clients rather than the hours Plaintiff was at work.  *See* Mr. Meghani Depo. (Doc. 38-2) at 23.

On July 30, 2012, prior to the move to the new building, Plaintiff emailed Dr.

Meghani the following:

> Dear Dr. Meghani,
> I had the opportunity to visit the new office with [Ms. Gilley] today.  It looks very nice, and I know it will serve us well.  However, I do have concerns about the office space that has been assigned to me.  Aside from obvious logistics that only concern space, I am more concerned about my job security, my ability to ethically treat patients and the possibility of safety issues that could arise with me seeing patients in one of those three offices.
> If there are plans in the near future to terminate me and that is why my office space was so significantly cut, I would appreciate some advanced warning.  If there are no plans to terminate me, I have concerns about my ability to safely and ethically treat patients in one of those three offices.  As I know you are aware, it is necessary for me to have some degree of a quiet environment in which to test patients and provide confidential therapy.  It is also necessary for me to have the ability to situate the room such that I have an exit without having to physically confront the patient to get to the door.  While it is not a frequent occurrence that I feel threatened by a patient, it does happen.
> I sincerely appreciate everything you have done for me.  I look forward to hearing any suggestions you have to address my above mentioned concerns.

Pl.'s Ex. (Doc. 39-2) at 2.  In response, Dr. Meghani emailed:

> Everything noted.
> You know I have been out for several weeks and possibly for months for reasons that "you may know some"
> Termination (no question, for my little sister)
> Everything is fixable as I always say.
> Let's meet and address this thing asap.
> But plz don't embarrass your brother with "termination" word.
> Your friend/brother/family

*Id.*  No witnesses could identify any substantial change in Defendants' financial state

between this date and the actual date of Plaintiff's termination.  Dr. Meghani Depo. (Doc.

38-1) at 16; Mr. Meghani Depo. (Doc. 38-2) at 27; Ms. Gilley Depo. (Doc. 38-5) at 19.

Defendants moved into the new office building in August 2012.  Mr. Bollaert Depo. (Doc. 38-4) at 5.  On Wednesday, September 5, 2012, Defendants installed a nameplate on the door of Plaintiff's new office.  Dr. Meghani Depo. (Doc. 38-1) at 9; Pl.'s Depo. (Doc. 38-3) at 37.  Later that day, Plaintiff informed Dr. Meghani that she was pregnant.  Pl.'s Depo. (Doc. 38-3) at 37.  The next two days, Thursday and Friday, Plaintiff saw patients at the hospital in accordance with her typical schedule.  *Id.*

The executive committee met that Thursday or Friday following the day Plaintiff informed Dr. Meghani of her pregnancy, and it was decided at that meeting that Plaintiff would be terminated.  Mr. Bollaert Depo. (Doc. 38-4) at 34-35.  The following Monday, September 10, 2012, Defendants terminated Plaintiff.  Defs.' Ex. (Doc. 38-7) at 1.

Plaintiff was provided with a termination letter which read as follows:

Dear [Plaintiff]:
As you may know, recent changes in the economy have forced us to make some difficult decisions here at Alabama Clinics. In order for the company to succeed in the future, we must streamline our organization today.
Therefore, it is with regret that I inform you that we are eliminating your position and terminating your employment, effective September 10, 2012. We will provide severance in the amount of one (1) months' pay. You will receive your severance pay and final paycheck on October 1, 2012. In addition, you will still be covered by your Blue Cross/Blue Shield Insurance until such time as you attain alternate health insurance coverage separate from [PRM]'s group insurance policy or for the next nine (9) months, whichever occurs first.
An exit interview is scheduled on September 10, 2012 at 4:00 PM with Adam Bollaert. You will receive information regarding benefits and unemployment at that time.
We have been pleased with the work that you've accomplished during your employment here.
We will be sorry to see you go.

*Id.*

At the time of termination, Plaintiff had patients in the waiting room awaiting their appointments with Plaintiff and more patients scheduled to show up that day.  Pl.'s Depo. (Doc. 38-2) at 37.

Plaintiff filed a complaint with the EEOC.  Compl. (Doc. 1) at 3.  In response to a request for information from the EEOC, Defendants noted that Plaintiff had been warned about misconduct during her employment and stated that Plaintiff was terminated "solely on economic considerations" and not on the basis of any violation of company policy. Pl.'s Ex. (Doc. 39-3) at 3, 5.  On February 18, 2014, the EEOC issued Plaintiff a notice of her right to sue.  Pl.'s Ex. (Doc. 1-2) at 1.

### B.    Statement of Facts in Dispute[4]

The parties do not agree on the facts surrounding Plaintiff's work performance. Defendants contend that Plaintiff was not working satisfactory hours and that her overall work performance was poor.  Plaintiff denies both contentions.  The relevant assertions, as presented by each side, are addressed below.

Plaintiff claims that she was hired with the understanding that she would need a flexible schedule.  Pl.'s Depo. (Doc. 38-3) at 8.  It is unclear whether Defendants actually dispute this fact.  In a response to the EEOC, Defendants stated that they "went out of [their] way to ensure [Plaintiff] would be able to schedule her hours and days around her parenting responsibilities."  Pl.'s Ex. (Doc. 39-3) at 2.  Dr. Meghani testified that "there's no such thing" as a need for providers to seek permission to come in late or leave early

when circumstances required, so long as the job obligations were satisfied.  Dr. Meghani Depo. (Doc. 38-1) at 11.  Regardless, Dr. Meghani specifically gave Plaintiff permission to leave early to take care of her son.  *Id.*

Defendants claim Plaintiff's poor performance began soon after the start of her employment.  Ms. Gilley Depo. (Doc. 38-5) at 15.  Defendants assert that Mr. Meghani counseled Plaintiff "at least once a month," that Plaintiff's misconduct was "nonstop," and that Plaintiff "was always trouble," Defs.' Ex. (Doc. 38-2) at 20-21, 28, and that Ms. Gilley counseled Plaintiff "numerous times," Ms. Gilley Depo. (Doc. 38-5) at 15.

However, Plaintiff asserts that she was confronted regarding time off on only a couple of occasions, once when she arrived late and once when she was out for a week, both times because her son was ill, but never for any other complaints regarding her work performance.  Pl.'s Depo. (Doc. 38-3) at 16-17.  Plaintiff contends that she was actually complimented on her performance by Sangeeta Nagar, an office administrator of some kind, who said that Plaintiff's "numbers were looking really good" and that Ms. Nagar anticipated that the numbers would improve further over time.  *Id.* at 11.

## IV.   DISCUSSION

Plaintiff has three claims:  (1) that Defendants violated Title VII of the Civil Rights Act by unlawfully discriminating against Plaintiff on the grounds of sex and pregnancy; (2) that Defendants violated FMLA through unlawful interference; and (3) that Defendants breached Plaintiff's employment contract in violation of Alabama state

---

[4] The court finds that a genuine dispute exists as to the following facts, especially when viewing the evidence in the light most favorable to Plaintiff, and that the proper place to settle such

law.  Compl. (Doc. 1) at 6-11.  Defendants move for summary judgment as to all claims

(Doc. 37).  The court addresses each claim separately below.

### A.      Title VII Claim

In Count I of the Complaint, Plaintiff alleges that Defendants terminated her

employment because of her sex and pregnancy, in violation of Title VII.  Compl. (Doc. 1)

at 6-7.  Defendants move for summary judgment.  Defs.' Br. (Doc. 38) at 4-6.

Title VII, as amended by the Pregnancy Discrimination Act, prohibits employment

discrimination on the basis of sex, including discrimination on the basis of pregnancy.

*Holland v. Gee*, 677 F.3d 1047, 1054 (11th Cir. 2012) (citing 42 U.S.C. § 2000e-2(a)).

> When analyzing pregnancy discrimination claims, we use the same type of
> analysis that we use for sex discrimination claims.  *Armstrong v. Flowers Hosp.,
> Inc.*, 33 F.3d 1308, 1312-13 (11th Cir. 1994).  A plaintiff alleging a claim of
> pregnancy discrimination must show that her employer intended to discriminate
> against her because of her pregnancy.  *Id.* at 1313.  She may make that showing
> using either direct or indirect evidence.  *Id.*  Direct evidence of discrimination is
> "evidence which reflects a discriminatory or retaliatory attitude correlating to the
> discrimination or retaliation complained of by the employee" and "that, if
> believed, proves the existence of a fact without inference or presumption."
> *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (alterations
> and quotation marks omitted).  Indirect evidence is circumstantial evidence.  *See
> Wright v. Southland Corp.*, 187 F.3d 1287, 1293 (11th Cir. 1999).
>
> There is more than one way to show discriminatory intent using indirect or
> circumstantial evidence.  One way is through the burden-shifting framework set
> out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.
> Ed. 2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450
> U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  Another way is "present[ing]
> circumstantial evidence that creates a triable issue concerning the employer's
> discriminatory intent."  *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328
> (11th Cir. 2011).  A triable issue of fact exists if the record, viewed in the light
> most favorable to the plaintiff, presents enough circumstantial evidence to raise a
> reasonable inference of intentional discrimination.  *See id.*  If the plaintiff presents
> enough circumstantial evidence to raise a reasonable inference of intentional
> discrimination, her claim will survive summary judgment.  *Id.*

---

disputes is before a jury.

*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).

Under the *McDonnell Douglas* framework, "the plaintiff first has the burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally." *McCalister v. Hillsborough County Sheriff*, 211 F. App'x 883, 884-85 (11th Cir. 2006). "To set out a *prima facie* case, the plaintiff may show that: (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) [s]he was replaced by a person outside h[er] protected class or was treated less favorably than a similarly-situated individual outside h[er] protected class." *Maynard v. Bd. of Regents of the Univ. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

In their brief, Defendants did not argue that Plaintiff is unable to establish a *prima facie* case of pregnancy discrimination. In fact, Defendants provide the court <u>no</u> legal authority at all (aside from one citation to 42 U.S.C. § 2000e(k)) as to why they should be granted summary judgment on Count I. Rather, Defendants "assert that Plaintiff was not terminated due to her pregnancy but rather economical/financial reasons as well as poor job performance." Defs.' Br. (Doc. 38) at 4. In her Response, Plaintiff notes that "Defendants have not alleged any issue with the *prima facie* case," but then Plaintiff, too, provides the court with no analysis establishing a *prima facie* case.

The court's review of the relevant facts in this case shows that Plaintiff is a member of a protected class, based on her pregnancy, who was qualified for her position and that she was subject to an adverse employment action when she was terminated.  A question arises as to the fourth *McDonnell Douglas* element of the *prima facie* case, whether Plaintiff can show that a comparator was treated more favorably than Plaintiff. Not until their reply brief do Defendants dispute that Plaintiff was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class.  Defs.' Reply (Doc. 40) at 1-4.  Yet again, Defendants provide the court <u>no</u> legal authority in support of their argument.  Regardless, for the reasons that follow, the court finds it unnecessary to determine whether a proper comparator exists in this case.

The "failure to produce a comparator does not necessarily doom the plaintiff's case."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  A plaintiff "does not have to show a comparator if she can show enough non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination." *Hamilton*, 680 F.3d at 1320 (citing *Smith*, 644 F.3d at 1328).

> [I]f the plaintiff cannot show a non-pregnant comparator who was treated differently, she alternatively can survive summary judgment by presenting circumstantial evidence "that creates a triable issue concerning the employer's discriminatory intent." *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) . . . . "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (footnote and quotation marks omitted).

*Hubbard v. Meritage Homes of Fla., Inc.*, 520 F. App'x 859, 863 (11th Cir. 2013) (parentheticals omitted) (unreported).   Similarly, "a plaintiff alleging pregnancy discrimination 'need not identify specific non-pregnant individuals treated differently from her, if the employer violated its own policy in terminating her.'" *Hubbard v. Meritage Homes of Fla., Inc.*, 520 F. App'x 859, 863 (11th Cir. 2013) (unreported) (quoting *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1321 (11th Cir. 2000)).

Here, Plaintiff has provided evidence, most convincingly in the form of the email from Dr. Meghani, that as of July 30, 2012, just one and a half months prior to her termination, Defendants had no intention of terminating her.  *See* Pl.'s Ex. (Doc. 39-2) at 2-3.  After that time, Defendants continued to work on the construction of Plaintiff's office and even installed a nameplate on Plaintiff's door.  Dr. Meghani Depo. (Doc. 38-1) at 9; Pl.'s Depo. (Doc. 38-3) at 37.  It wasn't until after Plaintiff told Dr. Meghani that she was pregnant that the executive committee decided that Plaintiff would be terminated.  Mr. Bollaert Depo. (Doc. 38-4) at 34-35.  In response to Defendants' allegations of poor work performance, Plaintiff alleges, and Defendants are unable to refute with any documentation, that she never received any substantial complaints regarding her work performance.  Pl.'s Br. (Doc. 39) at 17-19.  Despite that Defendants' employee handbook called for progressive discipline, Pl.'s Ex. (Doc. 39-7) at 20, Defendants concede Plaintiff never received written warnings for her behavior.  Dr. Meghani Depo. (Doc. 38-1) at 8; Mr. Meghani Depo. (Doc. 38-2) at 21; Ms. Gilley Depo. (Doc. 38-5) at 15.  Finally, despite Defendants' allegations of financial problems, no witnesses were able to identify any changes in Defendants' financial circumstances

between the date of Dr. Meghani's email and the date Plaintiff was terminated.  Pl.'s Br. (Doc. 39) at 13-17.  The court finds that Plaintiff has shown enough non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination.

Once a plaintiff establishes a *prima facie* case, the burden then shifts to the employer to provide "legitimate, nondiscriminatory reasons for the challenged employment action."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  A defendant's burden here is "exceedingly light," and a defendant must merely proffer a non-discriminatory reason for the adverse employment action, not prove it. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (quoting *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).  Defendants assert that Plaintiff was terminated for "economical/financial reasons as well as poor job performance."  Defs.' Br. (Doc. 38) at 4.  Because Defendants have proffered non-discriminatory reasons for terminating Plaintiff, Defendants' have satisfied their "exceedingly light" burden.

Once Defendants have proffered a nondiscriminatory reason for Plaintiff's termination, Plaintiff "then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination."  *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).  A plaintiff satisfies this burden when the plaintiff presents evidence that is "'sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Hunter v. Mobis Alabama, LLC*, 559 F. Supp. 2d 1247, 1258-59 (M.D. Ala. 2008) (citations omitted) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000)).

"Consequently, cases [turning on pretext] are 'only infrequently resolved on summary judgment because the credibility of the witnesses and the weight of the evidence, quintessential jury questions, are so central to any ultimate determination.'" *Id.* (quoting *Strickland v. Prime Care of Dothan*, 108 F. Supp. 2d 1329, 1332 (M.D. Ala. 2000)).

Plaintiff asserts that both nondiscriminatory reasons provided by Defendants for terminating Plaintiff are pretextual.  Plaintiff responded to Defendants' proffered reasons separately, and the court will do the same below.

## POOR WORK PERFORMANCE

Defendants argue that Plaintiff was terminated based on her poor work performance.  Defs.' Br. (Doc. 38) at 5-6.  Specifically, Defendants claim "Plaintiff was simply not meeting the expectations of her positon" because she was "often late to work," "often left early, was out of work too often," "failed to properly and timely prepare required reports," "did not see the proper number of patients," and "often refused to see patients." *Id.* at 5.

In regard to the allegations of poor performance centered on Plaintiff's work schedule, Plaintiff asserts that she was hired with the understanding that she would need a flexible schedule, Pl.'s Depo. (Doc. 38-3) at 8, and Defendants, at least at the time of the EEOC Response, did not appear to dispute this.  In fact, Defendants responded to the EEOC that they "went out of [their] way to ensure [Plaintiff] would be able to schedule her hours and days around her parenting responsibilities." Pl.'s Ex. (Doc. 39-3) at 2.  Dr. Meghani explained that "there's no such thing" as a need for providers to seek permission to come in late or leave early when a provider's circumstances required, so long as the

16

job obligations were satisfied.  Dr. Meghani Depo. (Doc. 38-1) at 11.  Notwithstanding this lax policy, Dr. Meghani acknowledged that he had specifically given Plaintiff permission to leave early to take care of her son.  *Id.*

Moreover, as Plaintiff points out, Defendants lack evidence to support a showing of poor work performance by Plaintiff.  Despite Defendants' Employee Handbook, which calls for progressive discipline "involv[ing] a verbal warning, followed by a written warning, followed by more severe action including possible termination, if the conduct does not improve," Pl.'s Ex. (Doc. 39-7) at 20, Defendants have provided no documentation of Plaintiff receiving verbal or written warnings consistent with Defendants' policy.  Dr. Meghani Depo. (Doc. 38-1) at 8; Mr. Meghani Depo. (Doc. 38-2) at 21; Ms. Gilley Depo. (Doc. 38-5) at 15.  This is despite Mr. Meghani's testimony that he counseled Plaintiff "at least once a month," that Plaintiff's misconduct was "nonstop," and that Plaintiff "was always trouble," Defs.' Ex. (Doc. 38-2) at 20-21, 28, and despite Ms. Gilley's testimony that she had counseled Plaintiff "numerous times," Ms. Gilley Depo. (Doc. 38-5) at 15.  Plaintiff disputes these allegations altogether, stating that she was confronted regarding time off on only a couple of occasions—once when she arrived late and once when she was out for a week.  Pl.'s Depo. (Doc. 38-3) at 16-17.  She maintains that both times were attributable to her son's illness and that she never received any other complaints regarding her work performance.  *Id.*  In fact, it is Plaintiff's contention that she was actually complimented on her performance by Sangeeta Nagar, an office administrator who told Plaintiff that her "numbers were looking really good."  *Id.* at 11.

Additionally, the court finds other evidence inconsistent with Defendants' assertion that Plaintiff was terminated for poor work performance.  Most interestingly, the termination letter Defendants provided Plaintiff mentioned nothing of poor performance.  Rather, it stated that her termination was a result of "recent changes in the economy" and, in fact, concluded by stating, "We have been pleased with the work that you've accomplished during your employment here."  Defs.' Ex. (Doc. 38-7) at 1. Similarly, in response to a request for information from the EEOC, Defendants, while briefly noting that Plaintiff had been warned about misconduct during her employment, stated that Plaintiff was actually terminated "solely on economic considerations" and not on the basis of any violation of company policy.  Pl.'s Ex. (Doc. 39-3) at 3, 5.  Lastly, although Defendants claim Plaintiff's poor performance began soon after the start of her employment, Ms. Gilley Depo. (Doc. 38-5) at 15, in 2011 Plaintiff was given a $10,000.00 raise.  Pl.'s Depo. (Doc. 38-3) at 11.

The court finds that Plaintiff has presented sufficient evidence to permit a reasonable fact finder to conclude that poor work performance was not the real reason for Plaintiff's termination, but rather is a pretext for unlawful discrimination on the basis of Plaintiff's gender and pregnancy.

*FINANCIAL REASONS*

Defendants also argue that Plaintiff was terminated as a result of Defendants' financial problems.  Defs.' Br. (Doc. 38) at 5.  Specifically, Defendants assert that "Defendants' business was doing poorly and thus required a reduction in manpower."  *Id.*

Plaintiff, however, points to evidence in the record that tends to show that the financial difficulties of the company could have been pretextual reasons for Plaintiff's termination.  While Plaintiff was employed with Defendants, Defendants designed and built a new office building, which included a space specifically intended for Plaintiff's practice.  Mr. Meghani Depo. (Doc. 38-2) at 26-27; Ms. Gilley Depo. (Doc. 38-5) at 18.  On July 30, 2012, less than one and a half months prior to her termination and prior to the move to the new building, Plaintiff emailed Dr. Meghani with concerns regarding her continued employment.  Specifically, Plaintiff expressed that she had "concerns with the office that had been assigned to [her]" and was, thus, "concerned about her job security."  Pl.'s Ex. (Doc. 39-2) at 2.  Plaintiff stated in her email, "If there are plans to terminate me and that is why my office space was so significantly cut, I would appreciate some advanced warning."  *Id.*  Dr. Meghani's response stated "Termination (no question, for my little sister)" and "plz don't embarrass your brother with 'termination' word."  *Id.*  Dr. Meghani concedes that, at that time, there were no plans to terminate Plaintiff.  Dr. Meghani Depo. (Doc. 38-1) at 9; Ms. Gilley Depo. (Doc. 38-5) at 18-19.  None of Defendants' witnesses could identify any substantial change in Defendants' financial state between when Plaintiff was told she would not be terminated and the actual date of Plaintiff's termination.  Dr. Meghani Depo. (Doc. 38-1) at 16; Mr. Meghani Depo. (Doc. 38-2) at 27; Ms. Gilley Depo. (Doc. 38-5) at 19.

On September 5, 2012, Defendants installed the nameplate on Plaintiff's door.  Dr. Meghani Depo. (Doc. 38-1) at 9; Pl.'s Depo. (Doc. 38-3) at 37.  Later that day, Plaintiff informed Dr. Meghani that she was pregnant.  Pl.'s Depo. (Doc. 38-3) at 37.  Plaintiff

states, "I told [Dr. Meghani] on Wednesday when I was seeing patients in the office. And then on Thursday and Friday, I was out seeing patients in the hospital.  And the following Monday is when I was let go."  *Id.* at 34.  At the time Plaintiff was terminated, she had patients in the waiting room awaiting their appointments with Plaintiff and "there were more scheduled to show up."  *Id.* at 37.

Again, none of Defendants' witnesses could identify any substantial event that could have caused a change in the financial state of the company around this date. Moreover, none of Defendants' witnesses could point to any documentation or specific criteria that was used to determine that the financial constraints of the company necessitated that a provider be terminated, or that Plaintiff should be that provider.  The court finds that Plaintiff has presented sufficient evidence to permit a reasonable fact finder to conclude that Defendants' financial condition was not the real reason for Plaintiff's termination, but is instead a pretext for discrimination on the basis of Plaintiff's gender and pregnancy.

The ultimate question in this case is whether the true motivation for Plaintiff's termination arose from financial problems faced by Defendants and Plaintiff's poor performance or whether the true motivation for Plaintiff's termination arose from her pregnancy.  Plaintiff has presented sufficient evidence such that a reasonable juror could conclude that her termination was motivated by discriminatory animus, and that Defendants' proffered reasons are pretextual.  Therefore, resolution of this ultimate question is most properly placed before a jury, and Defendants' Motion for Summary Judgment on Count I is due to be denied.

### B.      FMLA Claim

In Count II of the Complaint, Plaintiff claims that "Defendants violated the FMLA by discharging the Plaintiff as a means of interfering with, restraining, or denying the exercise or attempt to exercise Plaintiff's rights," under FMLA.  Compl. (Doc. 1) at 9. Defendants move for summary judgment on Count II on the ground that Plaintiff is unable to show her eligibility under the FMLA because Defendants did not employ "at least 50 employees within 75 surface miles of employee's worksite."  Defs.' Br. (Doc. 38) at 9.  In response, Plaintiff "concedes that, based on the evidence produced by the Defendants in discovery, [Defendants] did not in fact have the requisite number of employees" to be bound by the FMLA.  Pl.'s Br. (Doc. 39) at 20.  As Plaintiff did not oppose Defendants' request for summary judgment on this claim, the court finds that summary judgment is due to be granted on Count II.

### C.      Breach of Contract Claim

In Count III of the Complaint, Plaintiff alleges that Defendants breached Plaintiff's employment contract "on September 10, 2012[,] by terminating the Contract before the expiration of its term." Compl. (Doc. 1) at 10.  Defendants move for summary judgment on Count III.  Defs.' Br. (Doc. 38) at 12-14.  The entirety of Defendants' argument in support of summary judgment is that "the termination of Plaintiff was well warranted" and that "Plaintiff breached the contract by not performing her duties as required, whether written or implied, pursuant to the contract."  *Id.* at 13-14.

The court may grant Defendants' motion only if Defendants "show[] that there is no genuine dispute as to any material fact and that [Defendants are] entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(a). As discussed in-depth above, there is a genuine dispute as to the material facts regarding the true motivation behind Plaintiff's termination.   Resolution of this issue is most properly placed before a jury, and Defendants' Motion for Summary Judgment on Count III is therefore due to be denied.

## V.     CONCLUSION

For the reasons stated in this opinion, it is

ORDERED that the Motion for Summary Judgment (Doc. 37) is GRANTED in part and DENIED in part.   Specifically, Defendants' Motion is GRANTED as to Plaintiff's FMLA interference claim (Count II) but DENIED as to Plaintiff's Title VII discrimination claim (Count I) and breach of contract claim (Count III).

Done this 25th day of March, 2015.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE